IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

**OLIVER TRAVIS O'QUINN,**

      **Petitioner,**

**v.**                                   **Case No. 1:15cv021-WTH/CAS**

**JULIE JONES, Secretary,**
**Department of Corrections,**

      **Respondent.**
_____/

## REPORT AND RECOMMENDATION TO DENY § 2254 PETITION

On February 9, 2015, Petitioner Oliver T. O'Quinn, proceeding pro se, filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. ECF No. 1.   On August 6, 2015, Respondent filed an answer and exhibits. ECF No. 10.   Petitioner filed a reply on September 4, 2015.   ECF No. 11.

The matter was referred to the undersigned United States Magistrate Judge for report and recommendation pursuant to 28 U.S.C. § 636 and Northern District of Florida Local Rule 72.2(B).   After careful consideration of all issues raised, the undersigned has determined that no evidentiary hearing is required for disposition of this case.   *See* Rule 8(a), R. Gov. § 2254 Cases in U.S. Dist. Cts.   For the reasons stated herein, the pleadings and attachments before the Court show that Petitioner is not entitled to federal habeas relief, and this § 2254 petition should be denied.

## Background and Procedural History

On November 29, 2007, a grand jury in the Eighth Judicial Circuit, Alachua County, Florida, returned an indictment charging Petitioner O'Quinn with first degree murder, in violation of section 782.04(1)(a), Florida Statutes, in connection with events that took place on or between November 8, 2005, and November 10, 2005, resulting in the death of Michelle Herndon, by administering and/or injecting a lethal dose of Propofol.   Ex. B at 230-31.[1]  O'Quinn proceeded to a jury trial in May 2008. The prosecution presented more than thirty (30) witnesses; the defense did not present any witnesses.   Exs. D-I (transcript of jury trial).   On May 23, 2008, the jury returned a verdict finding O'Quinn guilty as charged.   Ex. C at 420; Ex. I at 790-92.   The judge adjudicated him guilty and sentenced him to life in prison.   Ex. C at 421-26; Ex. I at 833.

O'Quinn appealed his judgment and sentence to the First District Court of Appeal (DCA), assigned case number 1D08-2968.   *Id.* at 429; *see* Exs. N (Initial Brief), O (Answer Brief), P (Reply Brief).   The Initial Brief

---

[1]Hereinafter, all citations to the state court record, "Ex. –," refer to exhibits submitted with Respondent's answer, ECF No. 10.

presented five points on appeal.   Ex. N at i.   The First DCA per curiam

affirmed the case without a written opinion on September 2, 2009.   Ex. Q;

O'Quinn v. State, 15 So. 3d 583 (Fla. 1st DCA 2009) (table).

On November 12, 2009, O'Quinn filed a pro se motion for post-

conviction relief in the state trial court, pursuant to Florida Rule of Criminal

Procedure 3.850, raising fourteen (14) grounds.   Ex. R at 1-48.   The state

court summarily denied the motion on February 27, 2014.   *Id.* at 190-200;

Ex. S at 201-05.   O'Quinn moved for rehearing, which the court denied.

Ex. S at 373-96 (motion); Ex. T at 401-02.   O'Quinn appealed to the First

DCA and filed a pro se initial brief, assigned case number 1D14-1302.   Ex.

T at 408 (Notice of Appeal), Ex. U (Initial Brief).   The State did not file an

Answer Brief.   Ex. V.   The First DCA affirmed the case without a written

opinion on June 12, 2014.   Ex. W; O'Quinn v. State, 143 So. 3d 926 (Fla.

1st DCA 2014) (table).   The mandate issued July 8, 2014.   Ex. W.

As indicated above, O'Quinn filed a § 2254 petition in this Court on

February 9, 2015.   ECF No. 1.   He raises 19 grounds, including 11 claims

alleging ineffective assistance of counsel (IAC):

(1) **Trial Court Error**:   "Trial court erred in overruling a defense
    objection on grounds of unfair prejudice in violation of

O'Quinn's Sixth and Fourteenth Amendment rights."    *Id.* at 4.

(2) **Trial Court Error**:   "Trial court erred in overruling objection to testimony that O'Quinn stopped paying child support, in violation of his 6th and 14th Amendment rights."    *Id.* at 5.

(3) **Trial Court Error**:   "Trial court erred in overruling objection to testimony about O'Quinn lying about military experience, in violation of his 6th and 14th Amendment rights."    *Id.* at 6.

(4) **Trial Court Error**:   "Trial court erred in admitting documents indicating O'Quinn forged a document in applying for an Irish nursing license in violation of his 6th and 14th Amendment rights."    *Id.* at 7.

(5) **Cumulative Error**:   "Cumulative error deprived O'Quinn of his constitutional right to a fair trial by an impartial jury under the 5th, 6th, and 14th Amendments."    *Id.* at 8.

(6) **IAC**:   "Counsel was ineffective for failing to investigate to obtain business records from the Irish nursing board and Bank of America in violation of O'Quinn's 6th and 14th Amendment rights."    *Id.* at 9.

(7) **Trial Court Error**:   "The State violated O'Quinn's 14th Amendment right by presenting false evidence (Giglio violation claim)."    *Id.* at 10.

(8) **IAC**:   "Ineffective assistance of counsel for failing to impeach the testimony of Susan Thompson and failing to object to prosecution's mis-statement of that testimony violating O'Quinn's 6th and 14th Amendment rights."    *Id.* at 11.

(9) **IAC**:   "IAC for failing to elicit testimony from Jessica Seiple

that she knew O'Quinn was planning to work in Ireland, violating O'Quinn's 6th and 14th Amendment rights." *Id.* at 12.

(10) **IAC**:   "IAC for failing to investigate an alibi defense, violating O'Quinn's 6th and 14th Amendment rights." *Id.* at 13.

(11) **IAC**:   "IAC for failing to adequately investigate a defense of self-administered oral propofol overdose and call an expert toxicologist or anesthesiologist to refute the State's expert anesthesiologist, violating O'Quinn's 6th and 14th Amendment rights." *Id.* at 14.

(12) **Trial Court Error**:   "The State withheld a substantial change in the testimony of expert anesthesiologist thereby constituting a discovery violation, violating O'Quinn's 14th Amendment rights." *Id.* at 15.

(13) **IAC**:   "IAC for failing to investigate a potential material witness violating O'Quinn's 6th and 14th Amendment rights." *Id.* at 16.

(14) **IAC**:   "IAC for failing to move to suppress syringes and for failing to object to their admission at trial, in violation of O'Quinn's 4th, 6th, and 14th Amendment rights." *Id.* at 17.

(15) **IAC**:   "IAC for failing to move to suppress a broken vial of Promethazine and for failing to object to its admission as evidence, in violation of O'Quinn's 6th and 14th Amendment rights." *Id.* at 18.

(16) **IAC**:   "IAC for failing to object to testimony about O'Quinn's fingerprints and their location, in violation of O'Quinn's 6th and 14th Amendment rights." *Id.* at 19.

(17) **IAC**: "IAC for failing to object to irrelevant testimony from Belinda Herndon, in violation of O'Quinn's 6th and 14th Amendment rights." *Id*. at 20.

(18) **IAC**: "IAC for failing to object to the prosecution's misstatement of evidence, in violation of O'Quinn's 6th and 14th Amendment rights." *Id*. at 21.

(19) **Cumulative Error**: "Cumulative error deprived O'Quinn of his right to a fair trial in violation of his 4th, 5th, 6th, and 14th Amendment rights." *Id*. at 22.

Respondent filed an answer, with exhibits. ECF No. 10. O'Quinn has filed a reply. ECF No. 11.

## Analysis

Pursuant to 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), federal courts may grant habeas corpus relief for persons in state custody. Section 2254(d) provides, in pertinent part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). *See, e.g.,* Cullen v. Pinholster, 563 U.S. 170, 180-83 (2011); Gill v. Mecusker, 633 F.3d 1272, 1287-88 (11th Cir. 2011). "This is a 'difficult to meet' and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.'" Cullen, 563 U.S. at 181 (quoting Harrington v. Richter, 562 U.S. 86, 102 (2011), and Woodford v. Visciotti, 537 U.S. 19, 24 (2002)). This Court's review "is limited to the record that was before the state court that adjudicated the claim on the merits." *Id.*

For claims of ineffective assistance of counsel (IAC), the United States Supreme Court has adopted a two-part test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Strickland v. Washington, 466 U.S. 668, 687 (1984). To demonstrate ineffectiveness, a "defendant must show that counsel's performance fell

below an objective standard of reasonableness." *Id.* at 688.    To

demonstrate prejudice, a defendant "must show that there is a reasonable

probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different." *Id.* at 694.    "A reasonable

probability is a probability sufficient to undermine confidence in the

outcome." *Id.*    For this Court's purposes, importantly, "[t]he question 'is

not whether a federal court believes the state court's determination' under

the Strickland standard 'was incorrect but whether that determination was

unreasonable – a substantially higher threshold.'"    Knowles v. Mirzayance,

556 U.S. 111, 123 (2009) (quoting Schriro v. Landrigan, 550 U.S. 465, 473

(2007)).    "And, because the Strickland standard is a general standard, a

state court has even more latitude to reasonably determine that a

defendant has not satisfied that standard." *Id.*    It is a "doubly deferential

judicial review that applies to a Strickland claim evaluated under the

§ 2254(d)(1) standard." *Id.*

### Ground 1:    Trial Court Error – Overruling Objection to Prosecution Remark Regarding Last Day of Employment

In his first ground, Petitioner O'Quinn argues the state trial court erred

in overruling defense counsel's objection to the prosecutor's remark during

opening statement that November 9, 2005, was his last day at work as he

was terminated that day.    ECF No. 1 at 4, 24-27.    In particular, the trial

transcript reflects the following occurred during the prosecutor's opening

statement:

> MR. COLAW [prosecutor]: . . . November 9th, that was the
> defendant's last day at Shands.    He was terminated that day
> after his 7:00 to 7:00 shift.    That wasn't a surprise.    He knew
> that was coming.    They had talked to him sometime in October
> –
>
> MR. McGILL [defense counsel]:    Your Honor, may we
> approach?
>
> (Bench conference.)
>
> MR. McGILL:    If this is going where I think it's going, he's going
> to start talking about him getting fired and all this kind of stuff,
> and that's irrelevant.    All that's going to do is make him look
> like he's in a bad light.    The only reason –
>
> THE COURT:    I need to understand your objection.
>
> MR. McGILL:    My objection is they're about to introduce
> evidence that is not probative and it's 403 prejudice because of
> the fact they told him, the evidence that we have, that –
>
> THE COURT:    I need to understand the objection.    Are you
> saying that the fact that he was fired is not relevant?
>
> MR. McGILL:    I'm saying that he was not fired, and I think
> that's where they're starting, that the fact that he was fired and
> for the reasons that he was fired are not relevant.

THE COURT:   Of course I don't know what the facts are.

MR. McGILL:   And it's 403 prejudice.

THE COURT:   Will you be presenting testimony that he was fired?

MR. COLAW:   We'll be presenting testimony that he was terminated from SICU and knew that 11-9 would be his last day before the night of November 8th and that he had been offered to stay on as prn basis, which is a slightly different basis, which is where I'm headed, and he gave them available dates and said I want to work in November, December, despite him splitting the country and never coming back.

THE COURT:   And the relevance of that?

MR. COLAW:   Well, the relevance, the 9th was his last day, that he knew it was coming, as opposed to the defense making some argument, well, he can't be the killer, he went to work the day after the murder.

THE COURT:   It's obviously relevant.   You deposed the witnesses.   You're surprised that there's going to be testimony that his employment was terminated and he knew it?

MR. McGILL:   I'm disagreeing with the very facts that they're presenting.   The testimony that we had is not consistent with what he's arguing.   The testimony is that on his last day he was offered an opportunity –

THE COURT:   Mr. McGill, I need to stop you.   I don't know what the witnesses are going to say.   You know that both of you have a right to in opening statement tell the jurors what you have a good-faith belief what the witnesses are going to say.

MR. McGILL:   Okay.

THE COURT:   I can't stop the trial and have a proffer from those witnesses to judge whether Mr. Colaw has a good-faith belief that the witnesses are going to say what he said.   I have to let him proceed.

MR. McGILL:   I understand.

THE COURT:   You made your objection for the record.

MR. McGILL:   All right.   Thank you, your Honor.

(Bench conference concluded.)

THE COURT:   Mr. Colaw, you may continue.

MR. COLAW:   What the evidence will show is that in some point in October that Peggy Marker had had a discussion, a meeting with Oliver O'Quinn, and she indicated to him that it wasn't working in the SICU unit with his employment.   So she gave him options, and his options were this:   You either resign from the unit or we go through some – take you back into some training and orientation again and we do some further education to try to address these issues.

The defendant chose to give Miss Marker a handwritten note, which you will see, that basically said, I'm just – I'm not interested in going back through this stuff – that's not in the note, but he tells Miss Marker, I'm not interested in going back through the training, fine, I no longer will be employed in the SICU unit, and he knew before November 8th that November 9th was going to be his last day in that unit.

Ex. D at 28-32.

In his direct appeal, O'Quinn's first point asserted the state trial court erred in overruling the defense objection, on grounds of unfair prejudice, to the opening statement previewing evidence that he was fired for deficient performance.   Ex. N at i, 15-22.   The brief cites only state law except for the last sentence of the argument, which states, "The ruling deprived O'Quinn of his constitutional right to trial by an impartial jury under the Sixth Amendment and Fourteenth Amendment to the United States Constitution and Article I, Section 16 of the Florida Constitution."   *Id.* at 21-22.   Thus, it does not appear O'Quinn fairly presented this ground in state court as a federal claim.   *See, e.g.*, McNair v. Campbell, 416 F.3d 1291, 1303 (11th Cir. 2005) ("McNair's references to federal law in his state habeas proceedings are exactly the type of needles in the haystack that we have previously held are insufficient to satisfy the exhaustion requirement."); Ramos v. Sec'y, Fla. Dep't of Corr., 441 F. App'x 689, 696-97 (11th Cir. 2011) (holding that where petitioner "made one passing reference to federal law" in initial brief in state direct appeal, and did not argue federal standards or reference federal case law, issue was not fairly presented to state court and federal claim not properly exhausted).

Assuming this ground was fairly presented and exhausted, the ground lacks merit.   Opening statements are not evidence.   *See* Occhicone v. State, 570 So. 2d 902, 904 (Fla. 1990) ("Opening remarks are not evidence, and the purpose of opening argument is to outline what an attorney expects to be established by the evidence."); *see also, e.g.*, Brooks v. State, 175 So. 3d 204, 226 (Fla. 2015) (citing Occhicone and explaining that "[o]pening statements are not substantive evidence, but rather serve to outline what an attorney *expects* will be established by the evidence presented during trial").   Indeed, counsel have wide latitude in opening statements and closing arguments.   Breedlove v. State, 413 So. 2d 1, 8 (Fla. 1982) ("Wide latitude is permitted in arguing to a jury.   Logical inferences may be drawn, and counsel is allowed to advance all legitimate arguments." (citations omitted)); Spencer v. State, 645 So. 2d 377, 382-83 (Fla. 1994); Miller v. State, 161 So. 3d 354, 382 (Fla. 2015) (citing Spencer and explaining that "[i]n Florida, wide latitude is permitted in presenting opening and closing statements to a jury, and comments by the prosecutor will merit a mistrial only when they deprive the defendant of a fair and impartial trial, materially contribute to the conviction, are so harmful or

fundamentally tainted as to require a new trial, or are so inflammatory they might have influenced the jury to reach a more severe verdict that it would have otherwise rendered").

Here, as reflected by the excerpt from the trial transcript quoted above, the prosecutor indicated what he expected the evidence would show.   Defense counsel objected and stated he disagreed with the prosecutor's statement about what the evidence would show.   The trial judge did not abuse his discretion or otherwise err in overruling the defense objection.

Notably, when Peggy Marker testified during the trial concerning the end of O'Quinn's employment, defense counsel did not object.   *See* Ex. E at 263-69.   Her trial testimony is consistent with the prosecutor's description during opening statements.   *Compare id. with* Ex. D at 28-32.

Petitioner O'Quinn has not shown that the state court's rejection of this ground involved an unreasonable application of clearly established federal law or that it was based on an unreasonable determination of the facts.   *See* 28 U.S.C. § 2254(d)(1)-(2).   Accordingly, this ground should be denied.

### <u>Ground 2</u>:   Trial Court Error – Overruling Objection to Child Support Delinquency

In his second ground, Petitioner O'Quinn argues the trial court erred in overruling defense counsel's objection to testimony that he stopped paying child support.   ECF No. 1 at 5, 27-28.   In particular, Petitioner explains that, during the State's case, the prosecutor called Stacy O'Quinn, Petitioner's ex-wife and mother of their daughter, to testify about her contact with Petitioner during November and December 2005; when the prosecutor asked Ms. O'Quinn about whether Petitioner had been delinquent in paying child support, defense counsel objected.   *Id.* at 27. Petitioner argues the trial court erred in overruling defense counsel's objection because his delinquency constituted "bad act" impeachment and also because the introduction of this evidence violated section 90.403 as it was not relevant to the case and was unfairly prejudicial.   *Id.* at 28. Petitioner concludes this deprived him of his right to a fair trial under the Sixth Amendment to the U.S. Constitution and under article 1, section 16 of the Florida Constitution.   *Id.*

The trial transcript reflects the following transpired during the testimony of Stacy O'Quinn:

Case No. 1:15cv021-WTH/CAS

Q   I want to show you – if you will focus your attention to the January 6th Email, the third Email in that packet.   What is the defendant advising you that he's going to do now in that Email?

A   He says that he's going to take a short two-month travel assignment in London to pay off his hospital bill and save money for a return airline ticket because he missed his flight home.

Q   Now, did you take that to mean as working as a nurse?

A   Yes, sir.

Q   And he's telling you this – he indicates that the reason he needs to work for a while and raise money is because he doesn't have the ability to get back to the United Sates –

A   Yes, sir.

Q   -- because he missed a flight home?

A   Yes.

Q   Now, he also mentions in this Email to you some other information concerning his plans as soon as he gets back to the states.

A   Uh-huh.

Q   What does he tell you about those plans?

A   He says, After that I plan to live very close by so I can fully help to raise Madison [their daughter], take her to school and dance and be a good dad.   He says, I'm going to apply for a job at Winn or Savannah VA Clinic and work agency part-time.

Q   So in that Email he's still indicating to you that he's going to be coming back?

A   Yes, sir.

Q   If you will focus your attention to the January 17th, 2006 Email.   Now, let me ask you this:   When you were divorced from the defendant in January of 2002, was there an agreement or a court order or some arrangement concerning child support?

A   Yes.

Q   Had you had any problems with him paying child support prior to him leaving the country to Ireland?

A   No.

Q   In the January 17th, 2006 Email, what is he indicating to you that he's going to be doing?

A   That he's going to send a check for January and February as soon as he gets paid.

Q   And what did you –

MR. McGILL:   Your Honor, I'm going to object to the relevancy of this line of questioning.

THE COURT:   Overruled.

BY MR. COLAW:

Q   What did you understand that check to be for?

A   For child support.

Case No. 1:15cv021-WTH/CAS

Q   Had you received – when was the last month you had received a child support check from him?

A   Probably November.

Q   So he had not paid child support for December?

A   As far as I remember, no.

Q   January of 2006?

A   Yes.

Q   Did he ever send that check that he indicates he's going to in that Email?

A   No.

Q   Did he ever send another check at all?

A   No.

Ex. F at 431-33.

Similar to Ground 1, Petitioner O'Quinn raised no federal claim in state court concerning this issue.   As with Ground 1, he asserted only a conclusory statement in the Initial Brief on direct appeal referencing "his right to a fair trial by an impartial jury under the Sixth Amendment and Fourteenth Amendment to the U.S. Constitution," and otherwise cited only state law.   Ex. N at 23.

Assuming this ground is fairly presented and exhausted as a federal claim, it lacks merit.   The state trial court's ruling allowing the testimony, affirmed on direct appeal, did not affect the fundamental fairness of the trial.   *See* Alderman v. Zant, 22 F.3d 1541, 1555 (11th Cir. 1994).   The Eleventh Circuit has explained:

> As a general rule, a federal court in a habeas corpus case will not review the trial court's actions concerning the admissibility of evidence.   However, where a state court's ruling is claimed to have deprived a defendant of his right to due process, a federal court should then "inquir[e] only to determine whether the error was of such magnitude as to deny fundamental fairness to the criminal trial . . . ."   When reviewing state evidentiary rulings, the established standard is that habeas relief will only be granted if the state trial error was material as regards a critical, highly significant factor.

*Id.* (citations and footnote omitted); see also, e.g., Shaw v. Boney, 695 F.2d 528, 530 (11th Cir. 1983) ("Indeed, the general rule is that a federal court will not review a trial court's actions with respect to the admission of evidence."); Jacobs v. Singletary, 952 F.2d 1282, 1296 (11th Cir. 1992) ("We review state court evidentiary rulings on a petition for habeas corpus to determine only 'whether the error, if any, was of such magnitude as to deny petitioner his right to a fair trial.' . . . Erroneously admitted evidence deprives a defendant of fundamental fairness only if it was a 'crucial,

critical, highly significant factor' in the [defendant's] conviction." (citations omitted)).

Here, Petitioner has not shown error by the state court, much less that such error concerned a critical and highly significant factor, affecting the fundamental fairness of the trial.   Indeed, the child support issue was raised only briefly in the testimony, and the prosecutor's line of questioning appears relevant to show O'Quinn had not planned to return to the United States, as he was severing all ties and obligations.

Petitioner O'Quinn has not shown that the state court's rejection of this ground involved an unreasonable application of clearly established federal law or that it was based on an unreasonable determination of the facts.   *See* 28 U.S.C. § 2254(d)(1)-(2).   Accordingly, this ground should be denied.

### <u>Ground 3</u>:   Trial Court Error – Overruling Objection to Claimed Military Experience

In his third ground, Petitioner O'Quinn argues the state trial court erred in overruling defense counsel's objection to testimony Petitioner lied about military experience.   ECF No. 1 at 6, 29-30.   Petitioner explains the prosecution called Jessica Siepel, a friend of the victim and housemate of Petitioner, to testify and later recalled Ms. Siepel to provide additional

testimony.   *Id.* at 29.   During the recall testimony, the prosecutor asked if

Petitioner had ever told her about his personal background, and she said

he had told her he was a captain and a paratrooper in the Air Force.   *Id.*

When the prosecutor subsequently called Petitioner's sister, Leslie Colter,

as a witness, one of the questions he asked her was whether Petitioner

was ever in the military, and Ms. Colter answered, "No."   *Id.* at 30.

Similar to Grounds 1 and 2, Petitioner O'Quinn raised no federal

claim in state court concerning this issue.   As with Grounds 1 and 2, he

asserted only a conclusory statement in the Initial Brief on direct appeal

referencing "his constitutional right to trial by impartial jury under the Sixth

Amendment and Fourteenth Amendment to the U.S. Constitution and

Article I, Section 16 of the Florida Constitution."   Ex. N at 26-27.

Assuming this ground is exhausted as a federal claim, it does not

warrant federal habeas relief.   Ms. Siepel testified as the first witness

during the trial on May 20, 2008, and then she testified on recall on May 22,

2008, the third day of trial, as described by Petitioner.   Ex. D at 56-67

(testimony on direct), Ex. G at 441-56 (testimony on recall).   In particular,

near the beginning of her direct testimony on recall, the following exchange

occurred:

Q   Around you was the defendant – how would you describe his behavior around you as far as stories?   Was he conversational with you?

A   Yes, absolutely.

Q   And do you remember any stories the defendant told you about himself?

A   Yes.

Q   Did he ever give you any of his personal background?

A   Yes.

Q   What did he say about himself?

MR. McGILL:   Objection, your Honor; irrelevant.

THE COURT:   Overruled.

A   One of the most distinct stories he told me when he first moved in was of him being a captain in the Air Force, which kind of struck my fancy since my husband is in the military, and he told me that he was a paratrooper or para-jumper, the guys that jump out of the airplanes, and that he was one of the first, I guess, crews or squadrons, I don't know what the term is, to jump into Afghanistan after 9/11.

Ex. G at 443-44.   After her testimony on recall, four other witnesses

testified before Ms. Colter testified as described by Petitioner.   *See id.* at

457-64 (testimony of Sonia Reback), 464-68 (testimony of Scott Vernon),

470-77 (testimony of Laura Christie), 478-501 (testimony of Beecher

O'Quinn), 501-21 (testimony of Leslie Colter).   At the end of Ms. Colter's

testimony on direct, the prosecutor asked a final question:

> Q   One last question, Leslie.   Was the defendant ever in the military?
>
> A   No.

*Id.* at 517.   Defense counsel did not object.   *See id.*

Petitioner has not shown any error by the trial court that concerned a critical and highly significant factor, affecting the fundamental fairness of the trial.   The prosecutor did not question Ms. Colter further about Petitioner's lack of military service, nor did the prosecutor mention it during closing argument or rebuttal.   *See id.*; Ex. I at 670-728 (closing), 770-77 (rebuttal).

Moreover, the State presented a large amount of other testimony and evidence in proving its case.   *See, e.g.*, Ex. D at 136-42, 148-51, 158-60, 173, 178-81 (victim died because of injection of Propofol, an intravenous anesthetic, and victim had only "a very minute, very tiny . . . pinpoint puncture wound . . . on the inside of her left elbow," inflicted "very generally, around the time that she died" by "a very thin, very sharp implement" mostly likely a needle, consistent with being injected with something by someone with skill or precision); Ex. D 60-61, 84-85, 105, Ex. G at 442-44, 446, 475 (O'Quinn and victim knew each other, O'Quinn was

working as a registered nurse at Shands in 2005, victim "felt bad" for

O'Quinn, and O'Quinn found victim "very interesting"); Ex. D at 66-67, 70-

74, 78-82, 87, 102-03, 146, Ex. F at 410-14, 418-20, Ex. H at 572, and

State's Ex. 79 (O'Quinn was seen at victim's home during time frame

including her death on or around November 8; O'Quinn's car was also at

her home during time frame); Ex. D at 122-23, Ex. G at 532-33 (no signs of

forced entry at victim's home); Ex. E at 247-64, 273-85 (O'Quinn had

training and experience as registered nurse at Shands, he worked at

Shands through November 9, he could administer injection cleanly into

major vein of arm, he would know Propofol should be administered only

when patient has "protected airway," and he would have had access to

Propofol and other supplies for injection); Ex. F at 300-03 and State's

Exhibit 62 (show O'Quinn withdrew Propofol on November 3); Ex. E at 197-

98, 210, 213-23, Ex. G at 537-39 (on morning after autopsy, medical waste

including two syringes was found in trash can, along with other items from

victim's home, 62 feet from back door to victim's home; medical waste in

victim's trash also included two vials of Propofol, two 12 cc syringes, and

one 3 cc syringe); Ex. H at 627-29, 634, 638 (victim would have been

rendered unconscious in a minute given amount of Propofol found in her

body, it would have not been possible for victim to inject herself with that amount of Propofol and then dispose of items in trash behind her home, and given position of victim's body, another individual had to be involved); Ex. E at 225-26, 231, Ex. F at 332-34, 341, 368-70 (the 3 cc syringe and one of the 12 cc syringes had blood on them and the needle caps were swabbed for DNA testing; 12 cc syringe tested positive for victim's DNA and needle cover for that syringe matched samples from O'Quinn; DNA on needle cap matched O'Quinn's); Ex. F at 394-96, 427-32, Ex. G at 481, 506-07, 525-26 (O'Quinn misled employers, friends, and relatives about length and purpose of his trip to Ireland); State's Ex. 86 (O'Quinn's efforts to obtain nursing job in Ireland); Ex. H at 595-96 (O'Quinn told jail cellmate he gave a girl "a Ketimine drug or a Ketimine like substance" which would "put her down" because he thought she had put him down and shunned his advances and "she deserved a long and peaceful rest").

Thus, the brief testimony indicating Petitioner lied about military service appears slight in comparison to other evidence reflecting on Petitioner's culpability.   The state trial court's ruling allowing the testimony did not affect the fundamental fairness of the trial.

Petitioner O'Quinn has not shown that the state court's rejection of

this ground involved an unreasonable application of clearly established

federal law or that it was based on an unreasonable determination of the

facts.   *See* 28 U.S.C. § 2254(d)(1)-(2).   Accordingly, this ground should

be denied.

### <u>Ground 4</u>:   Trial Court Error – Admission of Evidence of Forgery in Applying for Irish Nursing License

In his fourth ground, Petitioner O'Quinn argues the trial court erred in

admitting evidence showing he forged a document in applying for an Irish

nursing license.   ECF No. 1 at 7, 30-31.   Petitioner explains that, at the

close of its case, the prosecution introduced letters and emails concerning

Petitioner's application for an Irish nursing license and, in response to

defense counsel's objection, asserted this evidence showed Petitioner did

not intend to return to the United States.   *Id.* at 30.   The trial court

overruled the objection, concluding the evidence was relevant to show

consciousness of guilt.   *Id.*   Petitioner argues "[t]hese documents included

correspondence between officials in Ireland and the United States

indicating that O'Quinn submitted a fraudulent letter to the Irish Nursing

Board," specifically "[t]he letter, dated December 20, 2005 and purportedly

from the Georgia Department of Human Resources (DHR) and signed by

'Greg Lawton, MS. EMTP,' represented that O'Quinn was a 'Licensed

Paramedic with full privileges and Registered Nurse with limited practice privileges currently in good standing'"; however, an official with Georgia DHR reported to the Irish Nursing Board in an email on January 20, 2006, that the letter "is a fraud," the letter is not "on our letterhead, nor is Mr. Lawton part of our staff," and "[i]n fact, we have no knowledge of a Mr. Lawton." *Id.* at 30-31.

Similar to the first three grounds, Petitioner O'Quinn raised no federal claim in state court concerning this issue.   As with the previous three grounds, he asserted only a conclusory statement in the Initial Brief on direct appeal referencing the deprivation of the right to trial "by impartial jury guaranteed him by the Sixth Amendment and Fourteenth Amendment to the U.S. Constitution and Article I, Section 16 of the Florida Constitution." Ex. N at 31.

Assuming this ground is exhausted as a federal claim, it lacks merit. The trial transcript reflects the following transpired when the prosecution, just before resting its case, offered the business records from the Irish Nursing Board as Exhibit E/State's Exhibit 86:

> MR. COLAW:   . . . At this time, the state would move state's E for identification.   It's a business records certification for the Irish Nursing Board's business records as they relate to Oliver Travis O'Quinn.   This certification was filed pursuant to

90.803(6) and 90.902(11) of the Florida Statutes, and the state would move state's E for identification into evidence as state's 86.

THE COURT:   Without objection?

MR. McGill:   Your Honor, may we approach just for a second?

(Bench conference.)

MR. McGILL:   We agree that per se as a business record it can be certified.   This is not prepared for purposes of litigation or such.   But we object as to the relevance to any of those records that pertain to his efforts to get on the nursing board or not, because they're not probative of whether or not he committed the crime or any element of the crime that he's alleged to have committed.   They're irrelevant.

THE COURT:   Is this an objection to all of the record or a part of the record?

MR. McGILL:   Well, he's only done a part of it.   He's trying to clean that up, and I appreciate that, but still we have objections that are not 403 but it's an objection as to basic relevance.

THE COURT:   So what in the record is the relevance?

MR. COLAW:   Well, your Honor, the only way I know to do this, it may not be a sidebar thing, there's probably 30, 40 pages in there, and some of that the relevance is different for different things.   Many of the pages are Email communications from Oliver O'Quinn to the nursing board that would include, and certainly the Court and the defense is aware, the one very significant Email from November 30th, the day he lands in Ireland where he indicates, after telling them I'll be back in two weeks, I'm not coming back.

THE COURT:   Anything that's inconsistent with what he told

other people about his reason for going and his return would be relevant.

MR. McGILL:   Okay.

THE COURT:   In other words, any of the deception practices at this point in time have some relevant value, just like flight.

MR. COLAW:   Right, and there's documents that show their phone number that could be matched with his records when he called in November, and there's the record that indicates when they finally tell him, no, you're rejected.

THE COURT:   This is activity that would support an inference that he intended to stay there and work rather than come back.

MR. COLAW:   Correct, that his flight was more consistent with consciousness of guilt than vacation or any other reason.

THE COURT:   So for that reason I'll allow it to come in.

(Bench conference concluded.)

THE COURT:   So that one is 86.

(State's Exhibit 86 received in evidence.)

Ex. H at 643-46.

Petitioner has not shown error by the trial court, much less that such error concerned a critical and highly significant factor, affecting the fundamental fairness of the trial.   Indeed, as the trial judge indicated, the records from the Irish Nursing Board were relevant to show O'Quinn intended to stay in Ireland and not return to the United States.   *See, e.g.,*

Straight v. State, 397 So. 2d 903, 908 (Fla. 1981) ("When a suspected person in any manner attempts to escape or evade a threatened prosecution by flight, concealment, resistance to lawful arrest, or other indications after the fact of a desire to evade prosecution, such fact is admissible, being relevant to the consciousness of guilt which may be inferred from such circumstance."); Escobar v. State, 699 So. 2d 988, 995 (Fla. 1997) ("We agree, as an abstract rule of law, the evidence of flight, concealment, or resistance to lawful arrest after the fact of a crime is admissible 'as being relevant to consciousness of guilt which may be inferred from such circumstances.'  However, in applying this principle to a particular case, there must be evidence which indicates a nexus between the flight, concealment, or resistance to lawful arrest and the crime(s) for which the defendant is being tried in that specific case."), *abrogated on other grounds by* Connor v. State, 803 So. 2d 598 (Fla. 2001).

Petitioner O'Quinn has not shown that the state court's rejection of this ground involved an unreasonable application of clearly established federal law or that it was based on an unreasonable determination of the facts.  *See* 28 U.S.C. § 2254(d)(1)-(2).  Accordingly, this ground should be denied.

## Ground 5:   Cumulative Error

In his fifth ground, Petitioner O'Quinn asserts a claim of "cumulative error."   ECF No. 1 at 8-9.   He does not specifically explain the claim. *See id.*; *see also id.* at 30-31.   This appears to concern the point he raised in his direct appeal, which also claimed cumulative error.   Regardless, because nothing in the first four grounds warrants relief, this ground likewise does not warrant relief and should be denied.   *See, e.g.*, Pope v. Sec'y, Dep't of Corr., 680 F.3d 1271, 1297 (11th Cir. 2012) ("As for cumulative error, we have declined to consider this kind of claim where a petitioner's 'state-court trial was not fundamentally unfair.'   Cargill v. Turpin, 120 F.3d 1366, 1386 (11th Cir. 1997).   Because Pope has not shown that the guilt phase of his trial was fundamentally unfair, we need not consider his cumulative-error claim.   But even if we were to consider Pope's guilt-phase claims in concert, there is no constitutional error, much less prejudicial error."); Morris v. Sec'y, Dep't of Corr., 677 F.3d 1117, 1132 (11th Cir. 2012) ("Plainly, Morris's cumulative error claim must fail.   As demonstrated above, none of Morris's individual claims of error or prejudice have any merit, and therefore we have nothing to accumulate.").

## Ground 6:   IAC – Failure to Obtain Records from Irish Nursing Board and Bank of America

In his sixth claim, Petitioner O'Quinn argues defense counsel provided ineffective assistance because he failed to obtain records from the Irish Nursing Board and Bank of America.   ECF No. 1 at 9, 31-33. Petitioner explains that he told defense counsel his original application to the Irish Nursing Board was made in July 2005 and his bank records would show his application fee was paid August 8, 2005, several months before the murder, thus countering the prosecution's argument that he had fled the country unexpectedly in late November 2005.   *Id.* at 32.

Petitioner raised this ground as the first claim in his Rule 3.850 motion.   Ex. R at 4-6.   The state post-conviction court discussed the Strickland standard and then summarily denied the claim, making the following findings:

> . . . Defendant alleges that trial counsel was ineffective for failing to investigate and obtain business records from the Irish Nursing Board and Bank of America.   According to Defendant, had counsel investigated, and introduced into evidence, his July 2005 application to the Irish Nursing Board, it would have proven that he did not go to Ireland in an attempt to flee, but merely to follow through on a plan to move to Ireland which was already . . . in place when the murder occurred.

The record reflects that the State never argued that Defendant did not initiate his plan to go to Ireland until after the murder had occurred.   Rather, the State argued that immediately after the murder Defendant moved up the timeframe in which he intended to go to Ireland; and, he never told anyone that he was intending to stay there.   See Trial Transcript at 33 (lines 5-9), 37 (lines 11-15), 38 (lines 7-13), 39 (lines 2-7), 40 (lines 5-9), 41 (lines 17-25) – 43 (lines 1-8), 578 (lines 2-25) – 581 (lines 1-23), 707 (lines 25), 711 (lines 7-25) – 712 (lines 1-6, 24-25) – 720 (lines 1-6), 730 (lines 9-25) – 731 (lines 1-9).   The State also presented evidence showing that Defendant told his friends and family that he was only going to Ireland on vacation for a few weeks.   *Id.* at 427 (lines 3-25) – 428 (lines 1-2), 481 (lines 7-21), 504 (lines 7-10), 506 (lines 9-18), 583 (lines 23-25) – 584 (lines 1-4).   Thus, the fact that Defendant started his application to the Irish Nursing Board in July 2005 is irrelevant to his post-murder behavior due to: (1) his lie to friends and family that he was only going to Ireland for a short vacation; (2) his rush to become a registered nurse in Ireland after the murder; and, (3) his flight to Senegal after his nursing registration was denied in Ireland.   *Id.* at 703 (lines 3-11).

Because the fact that Defendant started his nursing application prior to the murder does not affect the overwhelming evidence of his post-murder behavior, counsel did not err by failing to introduce it.   Furthermore, Defendant fails to show any prejudice because there is not a reasonable probability that evidence of when he started his application would have made a difference in the outcome of trial.   Even if it had been introduced, it would not have explained his post-murder behavior.   Defendant told no one that he was going to Ireland to work; or, more importantly, to live there permanently.   And, when his registration to be a nurse in Ireland was denied, rather than returning to the United States, Defendant fled to Senegal. For these reasons, Defendant fails to show either error by counsel or prejudice.   Accordingly, the claim raised is without merit.

Ex. R at 192-94.   On appeal, the First DCA affirmed without a written opinion.   This constitutes a ruling on the merits and is entitled to AEDPA deference.   *See* 28 U.S.C. § 2254(d); Harrington v. Richter, 562 U.S. 86, 98-100 (2011).

The state court record supports the post-conviction court's findings that the prosecution argued only that O'Quinn moved up the timeframe for his Ireland trip and O'Quinn did not tell anyone he was planning to stay in Ireland.   *See* Ex. D at 33, 37-43 (prosecution's opening statement); Ex. H at 578-81 (testimony of Susan Thompson); Ex. I 707, 711-12, 720, 730-31 (prosecution's closing argument).   The record also supports the court's finding that the prosecution presented evidence showing O'Quinn told his friends and family that he was only going to Ireland for a few weeks.   *See* Ex. F at 427-28; Ex. G at 481, 504, 506; Ex. H at 583-84.   Given these facts, together with the State's evidence linking O'Quinn to the murder and regarding O'Quinn's behavior after the murder, the post-conviction court did not unreasonably conclude that any evidence O'Quinn started his application to the Irish Nursing Board in July 2005, before the November 2005 murder, would not have made a difference to the outcome of the trial.

Petitioner O'Quinn has not shown the state court's rejection of this

ground was either (1) contrary to, or involved an unreasonable application

of, clearly established U.S. Supreme Court precedent, or (2) based on an

unreasonable determination of the facts in light of the evidence presented

in the state court proceeding.   *See* 28 U.S.C. § 2254(d)(1)-(2).   This

ground should be denied.

### <u>Ground 7</u>:   **Prosecution Presented False Evidence**

In his seventh claim, Petitioner O'Quinn asserts the prosecution

presented false evidence regarding when he initiated his application for an

Irish nursing license, constituting a violation under <u>Giglio v. United States</u>,

405 U.S. 150 (1972).   ECF No. 1 at 10-11, 33-36.   Petitioner raised this

ground as the second claim in his Rule 3.850 motion.   Ex. R at 6-10.

Although the state post-conviction court could have found the claim

procedurally barred as it should have been raised on direct appeal, the

court denied the claim on the merits, making the following findings:

> Defendant alleges that [t]he State violated Defendant's right to
> due process by presenting false evidence regarding when
> Defendant initiated his application for an Irish nursing license.
> Defendant is essentially arguing that the State committed a
> <u>Giglio</u> violation.   <u>Giglio v. U.S.</u>, 405 U.S. 150 . . . (1972).   To
> establish a <u>Giglio</u> violation, the defendant must show that:   (1)
> the testimony given was false; (2) the prosecutor knew the
> testimony was false; and (3) the statement was material.
> <u>Rodriguez v. State</u>, 39 So. 3d 275, 285 (Fla. 2010).   Here,
> Defendant alleges that the State misrepresented the time

> period when he initially applied to the Irish Nursing Board as
> November 2005, rather than July 2005.   As noted earlier, the
> State's primary focus in its argument regarding Defendant's
> flight to Ireland was related to how it occurred, not when it
> occurred.   The State put on evidence which showed that
> Defendant had already planned, months ahead of the murder,
> to travel to Ireland.   *See* Trial Transcript at 578 (lines 2-25) –
> 581 (lines 1-23).   Thus, the State never obfuscated this fact.
> Furthermore, the State presented no testimony which either
> directly or indirectly indicated that Defendant did not seek to go
> to Ireland until after the murder.   Because the State did not
> present false testimony, the claim raised is without merit.

Ex. R at 194-95.   On appeal, the First DCA affirmed without a written

opinion.   This constitutes a ruling on the merits and is entitled to AEDPA

deference.   *See* 28 U.S.C. § 2254(d); Harrington, 562 U.S. at 98-100.

The state court record supports the post-conviction court's findings

that the prosecution presented evidence that O'Quinn had already planned,

prior to the murder, to travel to Ireland.   *See* Ex. H at 578-81.   In

particular, Susan Thompson, a friend of O'Quinn's who worked for Delta

Airlines, testified that O'Quinn purchased a round-trip buddy flight pass

ticket from her in June 2005 and, at that time, she inputted information he

gave her, setting the ticket up as one for a trip to Ireland, with an initial

departure date in March 2006.   *Id.* at 578-79.   Ms. Thompson explained

the departure date could be changed, however, either by her or by O'Quinn

calling Delta directly, and he had a year to use it, through June 2006.   *Id.*

at 579-80.   Thus, contrary to O'Quinn's argument, as the post-conviction court concluded, the State did not present false testimony regarding when O'Quinn planned the trip to Ireland and did not obfuscate the fact that he planned the trip before the murder.

Petitioner has not shown the state court's rejection of this ground was either (1) contrary to, or involved an unreasonable application of, clearly established U.S. Supreme Court precedent, or (2) based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.   *See* 28 U.S.C. § 2254(d)(1)-(2).   This ground should be denied.

## Ground 8:   IAC – Testimony of Susan Thompson

In his eighth ground, Petitioner argues defense counsel provided ineffective assistance by not impeaching the testimony of Susan Thompson and not objecting when the prosecution misstated that testimony.   ECF No. 1 at 11, 36-40.   Petitioner raised this ground as the third claim in his Rule 3.850 motion.   Ex. R at 11-15.   The state post-conviction court denied the claim, making the following findings:

> Defendant alleges that trial counsel was ineffective for failing to impeach the testimony of State witness Susan Thompson and failing to object to the State's misstatement of that testimony. According to Defendant, he did not call Ms. Thompson on

November 21, 2005, to move his flight date ahead, but instead October 16, 2005, which was a month before the murder. During trial, Ms. Thompson testified that Defendant asked her to change the date for his flight pass, but she could not remember the date of his call.   *See* Trial Transcript at 581 (lines 3-25) – 584 (lines 1-4).   She additionally testified that *she never changed the flight date*, at any time.   Defendant did that on his own, separate from her.   *Id.* at 581 (lines 13-25) – 582 (lines 1-17).   Furthermore, the State never stated in its opening or argued in its closing that Ms. Thompson changed the date of Defendant's flight.   *Id.* at 36 (lines 19-25) – 38 (lines 1-15), 712 (lines 3-15), 718 (lines 3-6).   Thus, this entire claim is based on Defendant's misstatement of the record.   Because Ms. Thompson never testified that she changed the date of Defendant's flight, at any time, and because the State never argued that she did, Defendant fails to show either error by counsel or prejudice on that basis.   Accordingly, the claim raised is without merit.

Ex. R. at 195.   On appeal, the First DCA affirmed without a written opinion.

This constitutes a ruling on the merits and is entitled to AEDPA deference.

*See* 28 U.S.C. § 2254(d); Harrington, 562 U.S. at 98-100.

The state court record support's the post-conviction court's

determination that Ms. Thompson did not testify she changed the date of

O'Quinn's flight at any time; rather, she testified she never changed the

flight date and O'Quinn did that on his own.   Ex. H at 581-84.   Specifically,

Ms. Thompson testified that after O'Quinn purchased the buddy pass from

her, he called her to see if she could change his departure date.   *Id.* at

581.   She testified she could not remember exactly when this occurred, but

her best recollection was that it was within a week or two of November 29,

2005:

Q   Do you know approximately when he called you to do that?

A   I don't.

Q   Do you recall him making a phone call to you to let you –
well, strike that.   Do you remember getting a call from him
asking you to see if you could move the date up?

A   Right.

Q   What did you respond to him at that time?

A   I don't remember.   I think I was busy and I just said that I
would call him back later on in the week and we could do that,
or I might have asked him to call me back and I would set it up
for him.   I can't remember.

Q   Okay.   At the end of the day did you ever ultimately change
that for him?

A   No.

Q   Had you even like forgotten that he had called and
requested you to do that?

A   Yes, right.

Q   Did you at some point get another call from him where he
indicated he got it changed himself?

A   I did.

Q   And in that call did he tell you he was in fact getting on the
plane or on the plane?

A   He did.

Q   Do you recall the date of that phone call?

A   I don't recall the date.

Q   If he had gotten on the plane, if a flight had been changed and the records show that he got on the plane on November 29th, 2005, would that have been the date you got that call saying he had gotten it taken care of himself?

A   If that's what the records show, yes.

Q   It would have been whatever date he was actually on the flight?

A   Yes.

Q   In relation to the date that he called you to say don't worry about it, I took care of it and I'm on the plane, moving back from that date, approximately how much time was it when he gave you the initial phone call to see if you could change it for him? What I'm asking is was it a month before?   Three weeks?   A week?   What's your best estimate?

A   I don't remember.   A week to two weeks, a week maybe.

Q   So your best recollection today is between a week and two weeks?

A   Uh-huh.

Q   Is that a yes?

A   Yes.   Sorry.

*Id.* at 581-83.   As the post-conviction court found, the prosecution did not

argue that Ms. Thompson changed the flight date for O'Quinn.   *See* Ex. D at 36-38 (prosecution's opening statement); Ex. I at 712, 718 (prosecution's closing argument).   Thus, as the post-conviction court found, O'Quinn's claim here is based on his own misstatement of the record.

Petitioner O'Quinn has not shown the state court's rejection of this ground was either (1) contrary to, or involved an unreasonable application of, clearly established U.S. Supreme Court precedent, or (2) based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.   *See* 28 U.S.C. § 2254(d)(1)-(2).   This ground should be denied.

### Ground 9:   IAC – Testimony of Jessica Seipel

In his ninth ground, Petitioner argues defense counsel provided ineffective assistance by not eliciting testimony from Jessica Seipel that she knew he was planning to work in Ireland.   ECF No. 1 at 12, 40-41. Petitioner raised this ground as the fourth claim in his Rule 3.850 motion. Ex. R at 15-16.   The state post-conviction court denied the claim, making the following findings:

> Defendant alleges that trial counsel was ineffective for failing to elicit testimony from State witness Jessica Siepel that she knew Defendant was planning to work in Ireland.   As mentioned earlier, the fact that Defendant had filed an Irish nursing

application prior to the date of the murder is irrelevant to the State's argument regarding his consciousness of guilt. Immediately after the murder Defendant moved up the timeframe in which he intended to go to Ireland; and, he never told anyone that he was intending to stay there.   *See* Trial Transcript at 33 (lines 5-9), 37 (lines 11-15), 38 (lines 7-13), 39 (lines 2-7), 40 (lines 5-9), 41 (lines 17-25) – 43 (lines 1-8), 578 (lines 2-25) – 581 (lines 1-23), 707 (lines 25), 711 (lines 7-25) – 712 (lines 1-6, 24-25) – 720 (lines 1-6), 730 (lines 9-25) – 731 (lines 1-9).   The State also presented evidence showing that Defendant told his friends and family that he was only going to Ireland on vacation for a few weeks.   *Id.* at 427 (lines 3-25) – 428 (lines 1-2), 481 (lines 7-21), 504 (lines 7-10), 506 (lines 9-18), 583 (lines 23-25) – 584 (lines 1-4).   Thus, the fact that Defendant started his application to the Irish Nursing Board in July 2005 is irrelevant to his post-murder behavior due to: (1) his lie to friends and family that he was only going to Ireland for a short vacation; (2) his rush to become registered as a nurse in Ireland after the murder; and, (3) his flight to Senegal after his nursing registration was denied in Ireland.   *Id.* at 703 (lines 3-11).   For this reason, Defendant fails to show either error by counsel or prejudice.   Accordingly, the claim raised is without merit.

Ex. R. at 195-96.   On appeal, the First DCA affirmed without a written opinion.   This constitutes a ruling on the merits and is entitled to AEDPA deference.   *See* 28 U.S.C. § 2254(d); Harrington, 562 U.S. at 98-100.

As with Ground 6, *supra*, the state court record supports the post-conviction court's findings that the prosecution argued only that O'Quinn moved up the timeframe for his Ireland trip and O'Quinn did not tell anyone he was planning to stay in Ireland.   *See* Ex. D at 33, 37-43 (prosecution's

opening statement); Ex. H at 578-81 (testimony of Susan Thompson); Ex. I

707, 711-12, 720, 730-31 (prosecution's closing argument).   The record

also supports the court's finding that the prosecution presented evidence

showing O'Quinn told his friends and family that he was only going to

Ireland for a few weeks.   *See* Ex. F at 427-28; Ex. G at 481, 504, 506; Ex.

H at 583-84.   Given these facts, together with the State's evidence linking

O'Quinn to the murder and regarding O'Quinn's behavior after the murder,

the court did not unreasonably conclude any evidence that Jessica Seipel

knew O'Quinn was planning, before the murder, to work in Ireland, would

not have made a difference to the outcome of the trial.

Petitioner O'Quinn has not shown the state court's rejection of this

ground was either (1) contrary to, or involved an unreasonable application

of, clearly established U.S. Supreme Court precedent, or (2) based on an

unreasonable determination of the facts in light of the evidence presented

in the state court proceeding.   *See* 28 U.S.C. § 2254(d)(1)-(2).   This

ground should be denied.

### Ground 10:   IAC – Failed to Investigate Alibi Witness

In his tenth ground, Petitioner argues defense counsel provided

ineffective assistance by not investigating an alibi defense.   ECF No. 1 at

13, 42-44.   Petitioner raised this ground as the fifth claim in his Rule 3.850

motion.   Ex. R at 17-19.   The state post-conviction court denied the claim,

making the following findings:

> . . . Defendant alleges that trial counsel was ineffective for
> failing to investigate Defendant's alibi.   According to
> Defendant, he had an alibi for the time of the murder which
> counsel did not investigate.   During the trial, the State
> established that Defendant left work at 7:23 p.m. on November
> 8, 2005, and arrived home at 10:30 p.m.   *See* Trial Transcript
> at 265 (lines 2-9), 448 (lines 7-25) – 451 (lines 1-21).
> According to Defendant, he was at the library between 7:45
> p.m. and 9:00 p.m.   Then, he purportedly went to the grocery
> store from 9:00 p.m. until 9:30 p.m.   And, from there to
> McDonald's and then home.   Defendant contends that had
> counsel investigated his alibi, he could have shown that
> Defendant did not have time to commit the murder.
>
> At trial, Defendant's roommate testified that he told her
> during a 9:16 p.m. phone call that he had just left work and was
> going to dinner at the Atlanta Bread Company.   *See* Trial
> Transcript at 448 (lines 7-25) – 449 (line 1).   Then, during a
> 10:04 p.m. phone call, he told her that he was going to the
> grocery store.   *Id.* at 450 (lines 18-25) – 451 (lines 1-21).
> Neither of these statements by Defendant to his roommate
> around the time of the murder fits his alibi.
>
> This Court additionally notes that Defendant contends his
> counsel should have checked the library sign-in log and the
> grocery store surveillance camera for the night of the murder.
> However, Defendant was not returned to Alachua County until
> almost a year after the murder occurred.   There is no reason to
> believe that either of these items would still have existed over a
> year later.   And, Defendant's grocery store purchase is not
> inconsistent with the timeframe of the murder.   Furthermore,
> the factual allegation in Defendant's motion provides no

explanation for why he provided his roommate with a completely different alibi.   Because Defendant's purported alibi is inconsistent with what he told his roommate, Defendant fails to show that counsel erred by failing to present it at trial.   And, even if counsel had put forth Defendant's new alibi as a defense at trial, the only person through whom the alibi could have come in would have been Defendant himself.   However, faced with impeachment, Defendant chose not to testify.   *See* Trial Transcript at 649 (lines 1-25) – 652 (lines 1-21). Furthermore, State witness Ciara Riley's testimony placed Defendant's vehicle at the victim's house on the night of the murder.   *Id.* at 418 (lines 23-25) – 421 (lines 1-4), 673 (lines 20-25), 676 (lines 2-6).   For these reasons, Defendant fails to show either error by counsel or prejudice.   Accordingly, the claim raised is without merit.

Ex. R at 196-97.   On appeal, the First DCA affirmed without a written opinion.   This constitutes a ruling on the merits and is entitled to AEDPA deference.   *See* 28 U.S.C. § 2254(d); Harrington, 562 U.S. at 98-100.

The state court record supports the post-conviction court's findings regarding the evidence presented by the prosecution that O'Quinn left work at 7:23 p.m. on November 8, 2005, and arrived home at 10:30 p.m.   Ex. E at 265; Ex. G at 448-51.   The record also supports the court's findings that O'Quinn's roommate, Ms. Seipel, testified O'Quinn told her during a phone call at 9:16 p.m. that he had just left work and was going to the Atlanta Bread Company for dinner, Ex. G at 448-49, and then, during a 10:04 p.m. phone call, he told her he was stopping by the grocery on the way home,

*id.* 450-51.   As the court determined, Ms. Seipel's testimony regarding the statements made by O'Quinn in these calls is inconsistent with his asserted alibi that he went to the library between 7:45 p.m. and 9 p.m., and then to the grocery between 9 p.m. and 9:30 p.m. before stopping by McDonald's on the way home.   As the court also determined, given the almost one-year time period that passed between the murder and O'Quinn's return to Gainesville, any records at the library and grocery store, to support his alibi, would likely have no longer existed, and, further, the timing of the grocery store visit was not inconsistent with the murder.   In addition, as the court explained, O'Quinn himself would have had to testify to support his alibi and he chose not to testify.   Ex. H at 649-52.   Moreover, other witnesses placed O'Quinn and his car at the victim's house during the timeframe of the murder.   Ex. F at 410-14 (Peter Alcorn), 418-20 (Ciara Riley).

Petitioner O'Quinn has not shown the state court's rejection of this ground was either (1) contrary to, or involved an unreasonable application of, clearly established U.S. Supreme Court precedent, or (2) based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.   *See* 28 U.S.C. § 2254(d)(1)-(2).   This ground should be denied.

<u>**Ground 11:**</u>   **IAC – Failed to Investigate Defense and Call Expert**

In his eleventh ground, Petitioner argues defense counsel provided

ineffective assistance by not adequately investigating a defense of self-

administered oral Propofol overdose and not calling an expert toxicologist

or anesthesiologist to refute the State's expert anesthesiologist.   ECF No.

1 at 14, 44-48.   Petitioner raised this ground as the sixth claim in his Rule

3.850 motion.   Ex. R at 19-23.   The state post-conviction court denied the

claim, making the following findings:

> . . . Defendant alleges that trial counsel was ineffective for
> failing to adequately investigate a defense of self-administered
> oral Propofol overdose and call an expert toxicologist or
> anesthesiologist to refute the State's expert anesthesiologist.
> During trial, Dr. Martha Burt testified to a reasonable degree of
> medical certainty that the victim died from the intravenous
> administration of Propofol by a person other than the victim.
> *See* Trial Transcript at 149 (lines 15-25), 151 (lines 2-12), 159
> (lines 24-25) – 160 (lines 1-8).   However, she could not
> exclude the possibility that the Propofol was only introduced
> into the victim intravenously.
>
> During trial, Dr. Bruce Goldberger testified that it was
> impossible that the victim died from orally ingesting the Propofol
> which killed her.   *Id.* at 182 (lines 18-25) – 185 (lines 1-9).
> Furthermore, Dr. Robert Kirby testified that had the victim killed
> herself by orally ingesting the Propofol, which was improbable,
> she would have been the first person ever reported to have
> done so.   *Id.* at 635 (lines 12-25) – 636 (lines 1-25), 639 (lines
> 8-25) – 643 (lines 1-14).   He further testified that given the
> circumstances of how the victim was found it was probable that
> another person was involved in her death.   *Id.* at 637 (lines 1-

25) – 638 (lines 1-13).

> According to Defendant, counsel should have challenged these experts' opinions regarding the improbability of the victim dying from oral ingestion of the Propofol.   Given the testimony of Dr. Kirby that no one has ever died from the oral ingestion of Propofol, and that tests on animals showed that a volume of 3-7 liters of it would be required to have a negative effect, Defendant fails to show any error by counsel in failing to challenge Dr. Kirby's opinion.   Other than speculation and conjecture, Defendant alleges nothing in his motion which suggests Dr. Kirby's testimony on the aforementioned issues is incorrect.   For this same reason, Defendant fails to show any prejudice.   Accordingly, the claim raised is without merit.

Ex. R. at 198-99.   On appeal, the First DCA affirmed without a written opinion.   This constitutes a ruling on the merits and is entitled to AEDPA deference.   *See* 28 U.S.C. § 2254(d); Harrington, 562 U.S. at 98-100.

The state court record supports the findings and conclusions of the post-conviction trial court.   Specifically, as the post-conviction court found, Dr. Burt testified, to a reasonable degree of medical certainty, the victim died from Propofol toxicity, resulting from, in her opinion, an intravenous injection of Propofol given by a person other than the victim.   Ex. D at 149-51, 159-60.

Dr. Goldberger testified it was not possible, and "almost improbable," for the victim to have died from orally ingesting Propofol because it comes in small bottles, it's "almost like an oil," and "it smells disgusting, just

horrible," and he was "sure it tastes terrible" and "would produce a gag reflex" if someone tried to swallow it.   *Id.* at 182-85.

Dr. Kirby testified, when asked about oral ingestion, "the amount that she would have had to drink in order to do that would be impossible, in my estimation" and that if the victim had killed herself by orally ingesting the Propofol, she would have been the first such known case.   Ex. H at 635-36, 639-43.   Dr. Kirby also testified that the victim could not have injected herself with the amount of Propofol involved (two vials) and, given how the victim was found, it was probable that another person was involved in her death.   Ex. at 634, 637-38.   Notably, on cross, defense counsel did question Dr. Kirby about oral ingestion of Propofol and Dr. Kirby testified that it could happen and, further: "As I say, technically or theoretically it's possible that somebody could.   It's never been reported."   *Id.* at 639.

Given all this testimony, the state court did not unreasonably conclude that defense counsel did not perform deficiently or that O'Quinn had not shown prejudice resulting from counsel's decision not to have a defense expert toxicologist or anesthesiologist to refute the State's experts. Petitioner O'Quinn has not shown the state court's rejection of this ground was either (1) contrary to, or involved an unreasonable application of,

clearly established U.S. Supreme Court precedent, or (2) based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.   *See* 28 U.S.C. § 2254(d)(1)-(2).   This ground should be denied.

### <u>Ground 12</u>:   Prosecution Discovery Violation –<br>Change in Expert Testimony

In his twelfth ground, Petitioner argues the State withheld a substantial change in the testimony of the expert anesthesiologist, Dr. Robert Kirby, resulting in a discovery violation.   ECF No. 1 at 15, 48-50. Petitioner raised this ground as the seventh claim in his Rule 3.850 motion. Ex. R at 24-26.   As with Ground 7, *supra*, although the state post-conviction court could have found this claim procedurally barred because it should have been raised on direct appeal, the court denied the claim on the merits, making the following findings:

> Defendant alleges that the State withheld a substantial change in the testimony of its expert anesthesiologist thereby constituting a discovery violation.   According to Defendant, Dr. Kirby testified at deposition that a person could orally ingest Propofol; and, testified at trial that a person could not orally ingest Propofol.   Having reviewed Exhibit J of Defendant's motion, which is the relevant portion of Dr. Kirby's deposition, and Dr. Kirby's trial testimony, this Court finds that there is no inconsistency between the two testimonies.   *See* Trial Transcript at 635 (lines 12-25) – 643 (lines 1-14).   Accordingly, the claim raised is without merit.

Ex. R. at 199.   On appeal, the First DCA affirmed without a written opinion.

This constitutes a ruling on the merits and is entitled to AEDPA deference.

*See* 28 U.S.C. § 2254(d); Harrington, 562 U.S. at 98-100.

The state court record supports the findings and conclusions of the

post-conviction trial court.   As the post-conviction court found, no

inconsistency appears in between the deposition and trial testimonies of Dr.

Kirby.   *Compare* Ex. H at 635-43 (relevant trial testimony) *with* Ex. R at 95-

99 (relevant deposition testimony).   Specifically, Dr. Kirby testified at trial,

in pertinent part:

> Q   It was intimated on day one of this trial, Dr. Kirby, that
> perhaps it would be a possibility that Miss Herndon ingested,
> drank Propofol herself and that resulted in the 4.3 micrograms
> per milliliter of Propofol in her blood.   Is that possible?
>
> A   I think it would – the amount that she would have to drink in
> order to do that would be impossible, in my estimation.
>
> Q   What would be the amount – I mean, what's your
> estimation, based upon your experience and your knowledge in
> this area, that she would have had to orally ingest to get that
> level in her blood?
>
> A   Well, first of all, I have to say I have no experience
> personally with oral ingestion.   I can't find that that has ever
> happened in the world's literature.   However, studies have
> been done, toxicology studies in animals to find out how much
> Propofol being taken by mouth would have to go into the animal
> in order to cause 50 percent of the animals to dies.   That's

called an LD50.

So you maybe take a thousand or a hundred animals, you give varying levels until you get a death, and then you start looking to see what level you're at when you have 50 percent of the animals dying.   And the amount that it would take per kilogram, bear in mind now, her dose would have been 120 to 160 milligrams, the amount it would have taken per kilogram and then total does the animals would have to take, between 31,000 milligrams and 70,000 milligrams, which is hundreds of times more than she could possibly have taken.

To put that into terms which we can readily understand, a person seeking to ingest Propofol for the purposes of recreation or death, or whatever, suicide, would have to drink between three liters of Propofol and seven liters.   So picture a two-liter bottle of Coca-Cola, 7UP or whatever, and then think that the individual would have to drink two of those plus a half of another one to get enough Propofol to have the potential for death and all the way up to seven.   So it would be impossible, in my estimation, based upon animal toxicologic studies.   We obviously can't do studies that like that in humans.

Q   Now, you indicated having researched the world literature concerning the drug Propofol.   Have you researched and reviewed the world literature for all reported cases of suicide or accidental death from the drug Propofol?

A   I think I have.   I have gone over it many, many times.

Q   And approximately how many reported cases are there in the literature?

A   In the literature from around the world, there are 38 reported cases of Propofol abuse, of which 14 of the individuals who reported died.

Q   Do you believe there are likely more cases than this?

A   I believe there are many times more than that.   Most of the cases, I'm quite certain, are never reported.

Q   In all of the 14 reported cases of suicide or accidental death from Propofol, where was, as reported in the literature, the drug Propofol and the paraphernalia used to administer it found?

A   Two of the cases it didn't say.   In the other twelve cases, in every individual case the Propofol and the drug paraphernalia for injecting it were found next to the body.

Q   And you indicated earlier you had an opportunity to review the crime scene photographs that documented the scene and specifically how the victim, Michelle Herndon, was found in her home the morning of November 10th, 2005?

A   Yes, I did.

Q   Based upon your experience, your education, your expertise, what is the significance of how Michelle Herndon was found?

A   The significance is that in my view there had to be another individual involved, because for the reasons we've talked about, which I'll be glad to go over again if necessary, but the reasons we have discussed, there is no way that she could have taken enough of the drug to render herself unconscious, then get up and take all of the paraphernalia, bag it up in a Publix bag, which is how most of it was found, carry it outside, walk back in, lie down and then die.   That's just physiologically and physically not possible.

Ex. H at 635-38.   On cross-examination, Dr. Kirby testified, in relevant

part:

Q   Leaving those issues aside, it is possible that someone

could orally ingest amounts of Propofol, correct?

A   As I say, technically or theoretically it's possible that somebody could.   It's never been reported.

Q   Right, but it could happen?

A   Yes.

Q   And somebody could, even though this may be weird, somebody could snort it or something and that would be a trans-muco distribution, correct?

A   No, you couldn't snort Propofol.

Q   Why couldn't you?

A   Because it would immediately induce, among other things, laryngospasm, which would close off your airway.   And the trans mucosal, the ingestion doesn't mean in the nose. Ingestion means through the GI tract and down to the stomach and the bowels.

Q   Okay.   Well, I guess that's what I was asking.   So transmuco ingestion, the absorption rate and the time to take effect on that would be longer than a direct injection, correct?

A   Yes, it would be considerably longer.

Q   Okay.

*Id.* at 639-40.   In his deposition, Dr. Kirby testified in relevant part:

Q   Is propophol [sic] ever or have you ever heard of someone trying to take it orally?

A   No.   I think it would be practically impossible to take it orally because it's a really crumby solution to try to swill down.   But I

have not heard of anybody.

Q   Is it possible that somebody could squirt it in their mouth and then swallow it?

A   Sure.   It's physically possible.   I think it would come back up as quick as it went down, though.

Q   If it were taken orally and it did stay down, would it take longer to enter the bloodstream than an intravenous injection of the propophol [sic]?

A   Oh, absolutely.   It might not even enter the bloodstream depending on what the gut does with it.   But anything that you take orally, even rapidly absorbed drugs, do not reach the peak levels like they do if [you] have an injectable form and inject it intravenously.   That's an instantaneous rise.

Q   If somebody took propophol [sic], even a lethal amount orally, would it take some time to take effect?

A   Yes.

Q   Would a person be able to walk around, do a few household chores before –

A   I don't know.   I can't answer, because to my knowledge and my review of the literature on this, there's never been a reported case.   So I don't think anybody has any idea of what somebody might be able to do.   You have to remember, also, that acid in the stomach – propophol [sic] doesn't mix with water, so the acid in the stomach would probably have a major deleterious effect, because you're talking a liquid that doesn't have an enteric form or anything of the sort to get it through the stomach.

Ex. at 97-98.   In both his trial and deposition testimonies, Dr. Kirby

explained that although it was technically or theoretically possible for a person to orally ingest Propofol, it was not likely a person could do so (and, in his trial testimony, he further explained the large quantity a person would have to ingest to result in the amount found in the victim's blood).

Petitioner has not shown the state court's rejection of this ground was either (1) contrary to, or involved an unreasonable application of, clearly established U.S. Supreme Court precedent, or (2) based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.   *See* 28 U.S.C. § 2254(d)(1)-(2).   This ground should be denied.

### Ground 13:   IAC – Failure to Investigate Cecil Johnson

In his thirteenth ground, Petitioner asserts his counsel provided ineffective assistance by failing to investigate a potential material witness, Cecil Johnson, R.N.   ECF No. 1 at 16, 51-54.   Petitioner raised this ground as the eighth claim in his Rule 3.850 motion.   Ex. R at 26-29.   The state post-conviction court denied the claim, making the following findings:

> . . . Defendant alleges that trial counsel was ineffective for failing to investigate a potential material witness (Cecil Johnson).   In order to state a facially sufficient claim for failure to call a witness at trial, the movant must allege the following: (1) the identity of the potential witness; (2) the substance of the witness's proposed testimony; (3) an explanation of how the

omission of the proposed testimony prejudiced the outcome of the case; and, (4) a representation that the witness was available for trial. *Leftwich v. State*, 954 So. 2d 714, 714 (Fla. 1st DCA 2007) (citing *Nelson v. State*, 875 So. 2d 579, 583-84 (Fla. 2004)). Defendant provides this information.

According to Defendant, Cecil Johnson was a nurse who went to the same gym as the victim and had access to Propofol. Defendant argues that if the jury knew that the victim knew another nurse besides him, they would have acquitted him. However, the record reflects that the evidence of Defendant's guilt was overwhelming. First, the victim died from Propofol toxicity. Second, based on the circumstances surrounding her death, it was probable that another person injected her with the Propofol. *See* Trial Transcript at 149 (lines 15-25), 151 (lines 2-12), 159 (lines 24-25) – 160 (lines 1-8), 182 (lines 18-25) – 185 (lines 1-9), 637 (lines 1-25) – 638 (lines 1-13). Third, a vial of Propofol, a syringe that had been used to inject Propofol, and a syringe cap with Defendant's DNA were found in the garbage behind the victim's apartment. *Id.* at 690 (lines 3-22[]), 692 (lines 1-25) – 695 (lines 1-23). Fourth, Defendant had access to Propofol through his employment at Shands Hospital; and, there are records of his actually obtaining Propofol there. *Id.* at 690 (lines 22-25) – 691 (lines 1-14). Fifth, Defendant's DNA was on the syringe cap found in the garbage outside the victim's home. That syringe also contained the victim's blood. *Id.* at 695 (lines 20-23), 697 (lines 19-25) – 700 (lines 1-5), 772 (lines 16-25) – 774 (lines 1-14). Sixth, a witness places Defendant's vehicle at the victim's home on the night of the offense. *Id.* at 700 (lines 14-17). Seventh, Defendant stopped calling the victim after the night that she died, even though he would not have known that she was dead. *Id.* at 700 (lines 18-25) – 702 (lines 1-2). Finally, Defendant permanently left the country once he became a suspect in the murder. *Id.* at 703 (lines 3-20). The one person who was tied to all the evidence connected to the victim's murder was Defendant. *Id.* at 726 (lines 7-18). Thus, even if counsel had presented Cecil Johnson as a defense

> witness, there is not a reasonable probability that this person's
> testimony would have affected the outcome of the trial.
> Accordingly, the claim raised is without merit.

Ex. R. at 199-200.   On appeal, the First DCA affirmed without a written

opinion.   This constitutes a ruling on the merits and is entitled to AEDPA

deference.   *See* 28 U.S.C. § 2254(d); Harrington, 562 U.S. at 98-100.

The state court record supports the post-conviction court's findings.

In particular, records from Shands showed O'Quinn obtained Propofol

during his employment there and O'Quinn's DNA was on the cap to the

syringe, which contained the victim's blood, found in the garbage can

outside the victim's home.   Ex. F at 300-03, 332-34, 341, 368-70.

Witnesses placed O'Quinn and his car at the victim's home during the

timeframe of the murder.   Ex. F at 410-14, 418-20.   Records showed

O'Quinn did not call the victim after her murder.   Ex. M (State's Ex. 4 –

phone records of victim, State's Ex. 78 – phone records of O'Quinn); Ex. G

at 441.   O'Quinn left for Ireland, months earlier than planned, once he

became a murder suspect.   Ex. F at 394-96, 427-32; Ex. G at 481, 506-07,

525-26.   Given all this, the post-conviction court did not unreasonably

conclude that even if defense counsel had presented Cecil Johnson as a

witness, there was no reasonable probability it would have affected the

outcome of the trial.

Petitioner O'Quinn has not shown the state court's rejection of this ground was either (1) contrary to, or involved an unreasonable application of, clearly established U.S. Supreme Court precedent, or (2) based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.   *See* 28 U.S.C. § 2254(d)(1)-(2).   This ground should be denied.

### Ground 14:   IAC – Failure to Move to Exclude Syringes

In his fourteenth ground, Petitioner asserts his attorney provided ineffective assistance by failing to move to suppress syringes found in his bedroom and failing to object to their admission at trial.   ECF No. 1 at 17, 54-56.   Petitioner raised this ground as the ninth claim in his Rule 3.850 motion.   Ex. R at 30-33.   The state post-conviction court denied the claim, making the following findings:

> . . . Defendant alleges that trial counsel was ineffective for failing to move to suppress syringes found in Defendant's bedroom and for failing to object to their admission as evidence at trial.   While in the process of packing up Defendant's belongings, Defendant's landlord found two syringes in his bedroom.   After finding the syringes, the landlord called law enforcement, who took them into evidence.   *See* Trial Transcript at 383 (lines 8-22), 388 (lines 8-22).   Defendant contends that these syringes were illegally obtained because his landlord did not have a legal right to enter his room.

"The Fourth Amendment to the United States Constitution and Article I, section 12 of the Florida Constitution guarantee the right to be free from 'unreasonable searches and seizures . . . .'" *State v. Iaccarino*, 767So. 2d 470, 475 (Fla. 2d DCA 2000).   "Implicit in that guarantee is the requirement that an agent of the government perform those searches and seizures." *Id.* (citing *Burdeau v. McDowell*, 256 U.S. 465, 475 . . . (1921); *Bernovich v. State*, 272 So. 2d 505, 507 (Fla. 1973)).   "The test for determining whether private individuals are agents of the government is whether, in consideration of the circumstances, the individuals acted as instruments of the state." *Id.* (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 487 . . . (1971)). "To determine whether a private individual acts as an instrument of the state, courts look to (1) whether the government was aware of and acquiesced in the conduct; and (2) whether the individual intended to assist the police or further his own ends." *Id.* (citing *United States v. Cleaveland*, 38 F.3d 1092, 1093 (9th Cir. 1994)).

Here, Defendant's landlord found the syringes prior to having any contact with police.   And, the landlord did not act to assist the police or further his own ends.   In addition, the syringes were relevant to the murder charge because the victim was killed by being injected with Propofol.   Thus, had counsel moved to suppress the syringes, the motion would have been denied.   *See State v. Weiss*, 449 So. 2d 915, 918 (Fla. 3d DCA 1984) ("the police did not infringe on any constitutionally protected privacy interest that had not already been infringed upon by the private search").   Because the motion would have been denied, Defendant fails to show either error by counsel or prejudice.   Accordingly, the claim raised is without merit.

Ex. R at 200, Ex. S at 201-02.   On appeal, the First DCA affirmed without

a written opinion.   This constitutes a ruling on the merits and is entitled to

AEDPA deference.   *See* 28 U.S.C. § 2254(d); <u>Harrington</u>, 562 U.S. at 98-

100.

The state court record supports the post-conviction court's finding that O'Quinn's landlord found two syringes in O'Quinn's bedroom before the landlord had any contact with law enforcement.   Ex. F at 383-84.   The landlord found the syringes while packing up the remainder of O'Quinn's belongings, which O'Quinn had not removed after the deadline for him to vacate the premises.   Ex. F at 381-84, 387-88.   The landlord then called the police and the police then took them into evidence.   Ex. F at 383, 387-88, 390-92.   Given these facts, the court did not unreasonably conclude a defense motion to suppress would have been denied and, therefore, defense counsel did not perform deficiently by not filing such a motion. *See, e.g.*, Armstrong v. State, 46 So. 3d 589, 593 (Fla. 1st DCA 2010) ("Importantly, the protection against unreasonable searches and seizures applies only to cases involving governmental action; it does not apply when the search or seizure was conducted by a private individual."); *see also, e.g.*, Green v. State, 824 So. 2d 311 (Fla. 1st DCA 2002); State v. Palmer, 474 So. 2d 1250 (Fla. 1st DCA 1985); State v. Weiss, 449 So. 2d 915 (Fla. 3d DCA 1984).   Moreover, given all the other evidence presented by the State, the court did not unreasonably conclude O'Quinn did not show

prejudice.

Petitioner O'Quinn has not shown the state court's rejection of this ground was either (1) contrary to, or involved an unreasonable application of, clearly established U.S. Supreme Court precedent, or (2) based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.   *See* 28 U.S.C. § 2254(d)(1)-(2).   This ground should be denied.

### Ground 15:   IAC – Failure to Move to Exclude Promethazine

In his fifteenth ground, Petitioner asserts his counsel provided ineffective assistance by failing to move to suppress a broken vial of Promethazine found in his car and for failing to object to its admission into evidence.   ECF No. 1 at 18, 56-59.   Petitioner raised this ground as the tenth claim in his Rule 3.850 motion.   Ex. R at 33-36.   The state post-conviction court denied the claim, making the following findings:

> Defendant alleges that trial counsel was ineffective for failing to move to suppress the broken vial of promethazine and object to its admission as evidence.   During trial, the State introduced into evidence a vial of Promethazine which was found in Defendant's car as a result of a search warrant.   *See* 547 (lines 23-25) – 550 (lines 1-16).   The State also established that Promethazine was found in the victim's urine, which indicated that it was administered within a few days prior to her death.   *Id.* at 147 (lines 14-25), 158 (lines 9-14), 170 (lines 1-3), 171 (lines 5-25) – 172 (lines 1-4), 683 (lines 3-12), 727

> (lines 9-13). Because Promethazine was found in the victim's urine, meaning that it had been recently administered, the vial of Promethazine found in Defendant's car was relevant to how Defendant could have convinced the victim to let him inject her. Because it was relevant to an issue at trial, had counsel moved to suppress it as irrelevant, the motion would have been denied. Because the motion would have been denied, Defendant fails to show either error by counsel or prejudice. Accordingly, the claim raised is without merit.

Ex. S at 202. On appeal, the First DCA affirmed without a written opinion. This constitutes a ruling on the merits and is entitled to AEDPA deference. *See* 28 U.S.C. § 2254(d); <u>Harrington</u>, 562 U.S. at 98-100.

The state court record supports the post-conviction court's finding that the prosecution introduced into evidence a vial of Promethazine found in O'Qunn's car as the result of a search warrant. Ex. G at 547-50. The record also supports the finding that the prosecution presented evidence that Promethazine was found in the victim's urine, indicating it was administered within a few days before her death. Ex. D at 147, 158, 170-72. As the court explained, given that Promethazine was found in the victim's urine, the vial of Promethazine found in O'Quinn's car was relevant to explain how he could have convinced the victim to allow him to inject her. Accordingly, the state court did not unreasonably conclude that a defense motion to suppress or objection to this evidence would have been

denied and, therefore, defense counsel did not perform deficiently by not filing such a motion or raise such objection.   Moreover, given all the other evidence presented by the State, the court did not unreasonably conclude O'Quinn did not show prejudice.

Petitioner O'Quinn has not shown the state court's rejection of this ground was either (1) contrary to, or involved an unreasonable application of, clearly established U.S. Supreme Court precedent, or (2) based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.   *See* 28 U.S.C. § 2254(d)(1)-(2).   This ground should be denied.

### Ground 16:   IAC – Failure to Object to Fingerprint Testimony

In his sixteenth ground, Petitioner asserts defense counsel provided ineffective assistance by failing to object to testimony about his fingerprints and their location.   ECF No. 1 at 19, 59-60.   Petitioner raised this ground as the eleventh claim in his Rule 3.850 motion.   Ex. R at 36-37.   The state post-conviction court denied the claim, making the following findings:

> Defendant alleges that trial counsel was ineffective for failing to object to testimony about Defendant's fingerprints and their location.   Contrary to Defendant's argument otherwise, it was made clear at trial that none of the fingerprints found at the scene of the murder belonged to Defendant.   *See* Trial Transcript at 229 (lines 6-12), 242 (lines 21-25) – 243 (lines 1-

> 12), 244 (lines 15-25) – 245 (line 1).   And, that the fingerprints
> of Defendant that were found were found on "items collected
> from somewhere other than Michelle Herndon's residence."
> Even if the jury did believe that Defendant's fingerprints were
> found at the crime scene, this would not have been prejudicial
> because Defendant was friends with the victim and had been to
> her apartment.   For these reasons, Defendant fails to show
> either error by counsel or prejudice.   Accordingly, the claim
> raised is without merit.

Ex. S at 203.   On appeal, the First DCA affirmed without a written opinion.

This constitutes a ruling on the merits and is entitled to AEDPA deference.

*See* 28 U.S.C. § 2254(d); <u>Harrington</u>, 562 U.S. at 98-100.

The state court record supports the post-conviction court's finding

that it was made clear during the trial that O'Quinn's fingerprints were not

found at the victim's home but were "from items collected from somewhere

other than Michelle Herndon's residence."   Ex. E at 243; *see id.* at 229,

242-45.   Moreover, as the court explained, even if O'Quinn's fingerprints

had been found in the victim's home, this would not have been unusual, or

prejudicial, because O'Quinn and the victim were acquaintances.

Accordingly, the court did not unreasonably conclude that defense counsel

did not perform deficiently by not objecting to the fingerprint testimony or

that O'Quinn did not show prejudice.

Petitioner O'Quinn has not shown the state court's rejection of this

ground was either (1) contrary to, or involved an unreasonable application

of, clearly established U.S. Supreme Court precedent, or (2) based on an

unreasonable determination of the facts in light of the evidence presented

in the state court proceeding.   *See* 28 U.S.C. § 2254(d)(1)-(2).   This

ground should be denied.

### Ground 17:   IAC – Failure to Object to Testimony About Victim's Dog

In his seventeenth ground, Petitioner asserts defense counsel

provided ineffective assistance by not objecting to irrelevant testimony from

Belinda Herndon regarding the victim's dog.   ECF No. 1 at 20, 60-62.

Petitioner raised this ground as the twelfth claim in his Rule 3.850 motion.

Ex. R at 38-39.   The state post-conviction court denied the claim, making

the following findings:

> Defendant alleges that trial counsel was ineffective for failing to
> object to irrelevant testimony from State witness Belinda
> Herndon.   During direct examination, Belinda Herndon, the
> victim's mother, was asked by the State if the victim's dog was
> "still around."   *See* Trial Transcript at 97 (lines 16-19).   Ms.
> Herndon responded that she "had to have him put to sleep."
> *Id*.   Defendant contends that this testimony was irrelevant and
> that counsel should have objected to it on that basis.
> Defendant is correct that this testimony was irrelevant.
> However, Ms. Herndon's statement was isolated; and, it was
> not brought up by the State in closing argument.   For this
> reason, Defendant fails to show either error by counsel or
> prejudice.   Accordingly, the claim raised is without merit.

Ex. S at 203.   On appeal, the First DCA affirmed without a written opinion.

This constitutes a ruling on the merits and is entitled to AEDPA deference.

*See* 28 U.S.C. § 2254(d); Harrington, 562 U.S. at 98-100.

The state court record supports the post-conviction court's finding

that, although Ms. Herndon's statement about the victim's dog being put to

sleep irrelevant, that statement was also isolated.   In particular, Ms.

Herndon, the victim's mother, testified regarding the dog:

> Q   Now, was she [victim] – in November of 2005, did she live
> alone?
>
> A   Yes, she did.
>
> Q   Did she have any pets?
>
> A   Yes, she did.
>
> Q   What kind of pets did she have?
>
> A   She had adopted a Weimaraner from the Gainesville
> Humane Society about – she had had him about three years.
> His name was Duke.
>
> Q   And did Duke stay with her at her house here in Gainesville
> in November of 2005?
>
> A   Yes.
>
> Q   Now, is Duke still around?
>
> A   No, sir.   After Michelle's death he came to Live Oak to live
> with us, and another dog got in the yard and attacked him and

we had to have him put to sleep.   I'm sorry.

Q   That's okay.   What kind of demeanor was Duke?   Was he – and what I mean, was he aggressive with strangers?

A   No.

Q   Good with strangers?   Laid-back?

A   Laid-back.   Was not a guard dog at all.

Ex. D at 97.   As the post-conviction court found, the statement was isolated and the prosecution did not bring up that statement in closing argument.   *See* Ex. I at 670-728 (State's closing argument), 770-77 (State's rebuttal); *but see id.* at 725 (prosecutor argues in closing, after discussing Thomas Raucher's testimony regarding O'Quinn's admissions to him:   "But it's more telling, again, this choice of words, and you individually and collectively think about that expression, I put her down, and you think and consider whether there is a logical connection to the phrase that's often associated with the euthanizing of animals.   That happened? I had to put my dog down, I had to put my cat down, I had to put a horse down.   I had to put her down; think about that.").   *See also id.* at 738 (defense counsel references Ms. Herndon's testimony that Duke was not a guard dog).   The state court did not unreasonably conclude that defense counsel did not perform deficiently by not objecting to the statement or that

O'Quinn did not show prejudice.

Petitioner O'Quinn has not shown the state court's rejection of this ground was either (1) contrary to, or involved an unreasonable application of, clearly established U.S. Supreme Court precedent, or (2) based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.   *See* 28 U.S.C. § 2254(d)(1)-(2).   This ground should be denied.

### <u>Ground 18</u>:   IAC – Failure to Object to Prosecutor's Opening and Closing Statements Describing Testimony of Ciara Riley

In his eighteenth ground, Petitioner asserts defense counsel provided ineffective assistance by not objecting to the prosecutor's misstatement of testimony by Ciara Riley.   ECF No. 1 at 21, 62-64.   Petitioner raised this ground as the thirteenth claim in his Rule 3.850 motion.   Ex. R at 40-43. The state post-conviction court denied the claim, making the following findings:

> . . . Defendant alleges that trial counsel was ineffective for failing to object to the State's misstatement of evidence. According to Defendant, counsel should have objected when the State argued that witness Ciara Riley observed Defendant's vehicle at the victim's home on the night of the offense because Ms. Riley was not sure of the specific day she saw the vehicle there.   *See* Trial Transcript at 700 (lines 14-17).
>
> "Wide latitude is permitted in arguing to a jury."

> *Breedlove v. State*, 413 So. 2d 1, 8 (Fla. 1982).   Here, "the
> prosecutor [was] merely submitting to the jury a conclusion that
> he or she [was] arguing [could] be drawn from the evidence."
> *Davis v. State*, 698 So. 2d 1182, 1190 (Fla. 1997).   The State
> is "allowed to argue reasonable inferences from the evidence
> and to argue credibility of witnesses or any other relevant issue
> so long as the argument is based on the evidence."   *Miller v.
> State*, 926 So. 2d 1243, 1254-55 (Fla. 2006).   Here, the State
> was merely arguing that the jury should consider Ms. Riley's
> testimony as to when she saw Defendant's car at the victim's
> home in conjunction with the testimony of Jason Dearing and
> Scott Vernon.   Ms. Riley saw Defendant's vehicle at the
> victim's home two nights in a row, which was according to her
> either November 6-7 (Sunday and Monday) or November 7-8
> (Monday and Tuesday).   The victim was with Mr. Dearing on
> the night of Saturday, November 5, and with Mr. Vernon on the
> night of Sunday, November 6.   *See* Trial Transcripts at 24
> (lines 3-10), 73 (lines 2-7), 74 (lines 17-25), 77 (lines 11-22), 87
> (lines 11-16), 466 (lines 2-11), 468 (lines 7-11).   Thus,
> Defendant must have been there Monday night (November 7)
> and Tuesday (November 8).   For this reason, Defendant fails
> to show either error by counsel or prejudice.   Accordingly, the
> claim raised is without merit.

Ex. S at 203-04.   On appeal, the First DCA affirmed without a written

opinion.   This constitutes a ruling on the merits and is entitled to AEDPA

deference.   *See* 28 U.S.C. § 2254(d); <u>Harrington</u>, 562 U.S. at 98-100.

The state court record supports the post-conviction court's finding

that the prosecutor was arguing the jury should consider Ms. Riley's

testimony regarding when she saw O'Quinn's car together with the

testimony of Mr. Dearing and Mr. Vernon regarding when they were at the

victim's home, suggesting a reasonable inference that, because Dearing

was there on November 5 and Vernon was there on November 6, then the

two nights in a row that Riley saw O'Quinn's car there could have been

Monday November 7 and Tuesday November 8.   Ex. at 24, 73-74, 77, 87,

466, 468.    Accordingly, the court did not unreasonably conclude that

defense counsel did not perform deficiently by not objecting to the

argument or that O'Quinn did not show prejudice.

Petitioner O'Quinn has not shown the state court's rejection of this

ground was either (1) contrary to, or involved an unreasonable application

of, clearly established U.S. Supreme Court precedent, or (2) based on an

unreasonable determination of the facts in light of the evidence presented

in the state court proceeding.   *See* 28 U.S.C. § 2254(d)(1)-(2).   This

ground should be denied.

## <u>Ground 19</u>:   Cumulative Error

In his nineteenth ground, Petitioner asserts another claim of

cumulative error.   ECF No. 1 at 22.   Petitioner raised this ground as the

final claim in his Rule 3.850 motion.   Ex. R at 43-47.   The state post-

conviction court denied the claim, making the following findings:

> Defendant alleges that he is entitled to relief based on
> cumulative error by trial counsel.   A claim of cumulative error is

> unsuccessful if the movant fails to prove any of the individual
> errors that he alleges.   *Suggs v. State*, 923 So. 2d 419, 441
> (Fla. 2005).   In the instant motion, none of Defendant's
> grounds have merit.   Accordingly, this ground is also without
> merit.

Ex. S at 204.   On appeal, the First DCA affirmed without a written opinion.

This constitutes a ruling on the merits and is entitled to AEDPA deference.

*See* 28 U.S.C. § 2254(d); Harrington, 562 U.S. at 98-100.

Petitioner has not shown that the state court's rejection of this ground

involved an unreasonable application of clearly established federal law or

that it was based on an unreasonable determination of the facts.   *See* 28

U.S.C. § 2254(d)(1)-(2).   Indeed, the Eleventh Circuit has rejected an

argument of cumulative error in the context of IAC claims.   *See* Forrest v.

Fla. Dep't of Corr., 342 F. App'x 560, 565 (11th Cir. 2009).   Moreover, as

the state court explained, because each individual ground fails, this ground

likewise fails.

## Conclusion

Based on the foregoing, Petitioner Oliver Travis O'Quinn is not

entitled to federal habeas relief.   The § 2254 petition (ECF No. 1) should

be denied.

## Certificate of Appealability

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."   Rule 11(b) provides that a timely notice of appeal must still be filed, even if the court issues a certificate of appealability.

Petitioner fails to make a substantial showing of the denial of a constitutional right.   28 U.S.C. § 2253(c)(2); Slack v. McDaniel, 529 U.S. 473, 483-84 (2000) (explaining substantial showing) (citation omitted). Therefore, the Court should deny a certificate of appealability.

The second sentence of Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."   The parties shall make any argument as to whether a certificate should issue by objections to this Report and Recommendation.

Leave to appeal in forma pauperis should also be denied.   *See* Fed. R. App. P. 24(a)(3)(A) (providing that before or after notice of appeal is

filed, the court may certify appeal is not in good faith or party is not otherwise entitled to appeal in forma pauperis).

## Recommendation

It is therefore respectfully **RECOMMENDED** that the Court **DENY** the § 2254 petition (ECF No. 1).   It is further **RECOMMENDED** that a certificate of appealability be **DENIED** and that leave to appeal in forma pauperis be **DENIED**.

**IN CHAMBERS** at Tallahassee, Florida, on April 11, 2017.

**S/ Charles A. Stampelos**
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**


## NOTICE TO THE PARTIES

**Within fourteen (14) days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to these proposed findings and recommendations. Fed. R. Civ. P. 72(b)(2).   A copy of the objections shall be served upon all other parties.   A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.   Fed. R. Civ. P. 72(b)(2).   Any different deadline that may appear on the electronic docket is for the Court's internal use only and does not control.   If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a Report and Recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.   *See* 11th Cir. R. 3-1; 28 U.S.C. § 636.**